AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  MJ23-093 |
| Information associated with Target Telephones 1 and 2 (TT1 & TT2), for investigation of 18 USC Section 2314 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Target Telephone (TT1) associated with phone number (208)509-8598 and Target Telephone (TT2) associated with phone number 786-403-3168, further described in Attachments A1 and A2, incorporated herein by reference.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Section 2314 | Interstate Transportation of Stolen Property |

The application is based on these facts:
- ✓ See Affidavit of David Spitzer, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

David Spitzer, Special Agent HSI
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: ___02/28/2023___

_____
*Judge's signature*

City and state:  Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A-1**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number:

      a.      (208) 509-8598 (hereinafter "Target Telephone 1" or "**TT1**"). **TT1** is a cellular telephone with International Mobile Subscriber Identity (IMSI) 310240225402804, with subscriber "copy_1 1478424248," at 1478424248, Boise, ID 83706, with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT1** is described herein and in Attachment A1, and the location information to be seized is described herein and in Attachment B.

The subscriber/customer of the Target Cell Phone is unknown. The identity of the person who is the subject of the criminal investigation is David SUBIL.

2.      The Target Cell Phone **TT1**.

3.      The property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713. As such, this warrant authorizes the collection of subscriber records, cell site data, and cell site triangulation information regarding the Target Cell Phones. **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).** Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.     <u>Section I: Information to be Disclosed by T-Mobile</u>

       1.     **Subscriber/Account Information.** The following non-content information about the customers or subscribers associated with the Account listed in Attachment A1:

          a.     Names (including subscriber names, user names, and screen names);

          b.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

          c.     Local and long distance telephone connection records from **December 27, 2022, through February 27, 2023**;

          d.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions from **December 27, 2022, through February 27, 2023**;

          e.     Length of service (including start date) and types of service utilized;

          f.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifiers (MEID), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identity Identifiers (IMSI), or International Mobile Equipment Identities (IMEI);

g.     Other subscriber numbers or identities (including the registration Internet Protocol (IP) address); and

h.     Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.     **Historical Cell Site Location Information**.

a.     All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from **December 27, 2022, through February 27, 2023**, including:

i.     the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii.    historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received. This information is to be provided irrespective of the application, name, or report utilized by T-Mobile. Accordingly, this information includes the following data sets to the extent that they are collected by T-Mobile: RTT, PLU, PCMD, LOCDBOR, EVDO, True Call, ALULTE, and Timing Advance.

b.     The physical address and coverage maps of cell towers used by the Target Cell Phone(s).

II.    **Section II: Information to Be Seized by the Government**

1.     All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2314, Interstate Transport of Stolen Property involving Christopher DELGADO, Juan SANCHEZ, David SUBIL, and/or previously unidentified subject(s).

2.     All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.     All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

ATTACHMENT B- 2
USAO# 2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

4.      Location Information regarding the Target Cell Phone(s).

2

Law enforcement personnel (who may include, in addition to law enforcement

3

officers and agents, attorneys for the government, attorney support staff, agency personnel

4

assisting the government in this investigation, and outside technical experts under

5

government control) are authorized to review the records produced by T-Mobile in order

6

to locate the things particularly described in this Warrant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT B- 3
USAO# 2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A-2**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number:

a.      (786) 403-3168 (hereinafter "**Target Telephone 2**" or "**TT2**"). **TT2** is a cellular telephone with International Mobile Subscriber Identity (IMSI) 310260552952910, with subscriber "David SUBIL," at 6801 SW 83rd Place, Miami, FL 33143 with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT2** is described herein and in Attachment A2, and the location information to be seized is described herein and in Attachment B.

2.      The Target Cell Phone TT2.

The property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

Attachment A-2
USAO 2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713. As such, this warrant authorizes the collection of subscriber records, cell site data, and cell site triangulation information regarding the Target Cell Phones. **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).** Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.   **Section I: Information to be Disclosed by T-Mobile**

1.   **Subscriber/Account Information.** The following non-content information about the customers or subscribers associated with the Account listed in Attachment A1:

a.   Names (including subscriber names, user names, and screen names);

b.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.   Local and long distance telephone connection records from **December 27, 2022, through February 27, 2023**;

d.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions from **December 27, 2022, through February 27, 2023**;

e.   Length of service (including start date) and types of service utilized;

f.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifiers (MEID), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identity Identifiers (IMSI), or International Mobile Equipment Identities (IMEI);

ATTACHMENT B- 1
USAO# 2018R00962

g.      Other subscriber numbers or identities (including the registration Internet Protocol (IP) address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Historical Cell Site Location Information**.

a.      All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from **December 27, 2022, through February 27, 2023**, including:

i.      the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii.      historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received. This information is to be provided irrespective of the application, name, or report utilized by T-Mobile. Accordingly, this information includes the following data sets to the extent that they are collected by T-Mobile: RTT, PLU, PCMD, LOCDBOR, EVDO, True Call, ALULTE, and Timing Advance.

b.      The physical address and coverage maps of cell towers used by the Target Cell Phone(s).

II.    **Section II: Information to Be Seized by the Government**

1.      All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2314, Interstate Transport of Stolen Property involving Christopher DELGADO, Juan SANCHEZ, David SUBIL, and/or previously unidentified subject(s).

2.      All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.      All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

ATTACHMENT B- 2
USAO# 2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    4.     Location Information regarding the Target Cell Phone(s).

    Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by T-Mobile in order to locate the things particularly described in this Warrant.

ATTACHMENT B- 3
USAO# 2018R00962

# AFFIDAVIT OF DAVID SPITZER

STATE OF WASHINGTON      )
                               )      ss
COUNTY OF KING           )

     I, David Spitzer, Special Agent of Homeland Security Investigations (HSI), being first duly sworn, upon oath, depose and state the following:

## INTRODUCTION

     1.     I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephone(s) (hereinafter, the "**Target Telephone(s)**"):

     a.     (208) 509-8598 (hereinafter "**Target Telephone 1**" or "**TT1**"). **TT1** is a cellular telephone with International Mobile Subscriber Identity (IMSI) 310240225402804, with subscriber "copy_1 1478424248," at 1478424248, Boise, ID 83706, with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT1** is described herein and in Attachment A1, and the location information to be seized is described herein and in Attachment B.

     The subscriber/customer of the Target Cell Phone is unknown. The identity of the person who is the subject of criminal investigation is David SUBIL.

     b.     (786) 403-3168 (hereinafter "**Target Telephone 2**" or "**TT2**"). **TT2** is a cellular telephone with International Mobile Subscriber Identity (IMSI) 310260552952910, with subscriber "David SUBIL," at 6801 SW 83rd Place, Miami, FL 33143, with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT2** is described herein and in Attachment A2, and the location information to be seized is described herein and in Attachment B.

2.      I further request the tracking authorized pursuant to this warrant apply not only to the target telephone numbers, but also to any telephone number subsequently assigned to the telephone bearing the MSID or ESN number for **TT1** or **TT2** or to any cellular telephone bearing different MSID or ESN number, but using the same telephone number currently assigned to **TT1** or **TT2.**

## ECPA

3.      The Court has jurisdiction to issue the proposed warrants under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is the Western District of Washington, a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

4.      This is the first application in this judicial district for a search warrant authorizing disclosure of the above information for **TT 1 and 2** in connection with this investigation. Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).

## AGENT BACKGROUND

5.      I am a Special Agent with United States Homeland Security Investigations (HSI) and have been so employed since January 2020. In February 2021, I graduated from the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Centers (FLETC) in Glynco, Georgia. While at FLETC, I received nearly 1000 hours of training in such areas including, but not limited to criminal law, human smuggling/trafficking investigations, and criminal procedures. Prior to being employed with HSI, I was employed as an agent with the United States Border Patrol (USBP) for eleven years and was assigned to the Sector Intelligence Units in El Centro, CA, and Blaine, WA. In this capacity, I was responsible for conducting criminal investigations regarding the violation of immigration laws of the United States. In 2009, I graduated from the United States Border Patrol Academy at the FLETC in Artesia, New Mexico.

My education includes a Bachelor of Arts degree in Political Science and a Bachelor of Arts degree in Criminology from the University of Florida.

6.      I am assigned to HSI's Border Security Enforcement Team (BEST) and Air and Marine group in Blaine, WA (hereinafter "HSI Blaine"), which focuses on the enforcement of immigration and narcotics laws, including human trafficking and smuggling, as well as the investigation of transnational gangs. I am authorized to investigate and enforce violations of federal criminal statutes, including those in Titles 8, 18, and 21 of the United States Code.

7.      The information in this affidavit is based upon, among other things, the investigation that I have conducted in this case, my training and experience, information from other agents and witnesses, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation. Because this Affidavit is submitted for the limited purpose of securing a search warrant for information associated with certain cellular telephones, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of the requested warrant.  When the statements of others are set forth in this affidavit, they are set forth in substance and in part. Times listed in the affidavit are approximate.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2314, Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting have been committed by Christopher DELGADO, Juan SANCHEZ, David SUBIL and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

AFFIDAVIT OF SA DAVID SPITZER - 3
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## RELEVANT LAW AND ADDITIONAL KNOWLEDGE OF AFFIANT

9.      This investigation concerns violations, by Chris DELGADO, Juan SANCHEZ, David SUBIL and others known and unknown of the following:

  a.      Title 18 United States Code (18 U.S.C.) Section 2314, Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting.

10.     I know from training and experience that 18 U.S.C. Section 2314 makes it illegal to an individual to have: 1) unlawfully transported or caused to be transported in interstate or foreign commerce; (2) goods, wares, merchandise, securities, or money having a value of $5,000 or more which are stolen, converted or taken by fraud; and (3) knowing the same to be stolen, converted or taken by fraud.

## STATEMENT OF PROBABLE CAUSE

### A.      Initial Information

11.     On January 24, 2023, Homeland Security Investigations (HSI) Blaine received a report from the Stanwood Police Department. It was reported an individual, purportedly from Safeway, had stolen hundreds of thousands of dollars' worth of Russian King Crab and Opilio Crab.

12.      On January 23, 2023, Snohomish County Sherriff's Office (SCSO) Deputy Sennen Klassen responded to a fraud complaint at North Star Cold Storage, located in Stanwood, Washington. North Star Cold Storage processes, ships, and stores frozen products for other businesses throughout the United States. The Vice President of North Star Cold Storage, Linda Boggs, reported one of her customers, Alexander Gorelik who owns Arctic Seafoods based in San Francisco, California, was the victim of fraud.  Gorelik authorized the release of shipments of Russian King Crab from North Star Cold Storage on January 18, 2023, and January 20, 2023, to someone claiming to represent Safeway, a large chain of grocery stores throughout the United States.

13.     Deputy Klassen contacted Gorelik and learned he was contacted by individuals purporting to represent Safeway. These individuals used the following email

AFFIDAVIT OF SA DAVID SPITZER - 4
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

following addresses: chrisdelgado@safewaycorporate.com and jenniferzavala@safewaycorporate.com.  We believe these email accounts are owned and operated by David SUBIL. Gorelik received documents to open an account with what he thought was Albertson's (Safeway's parent company) and received a vendor number. On January 3, 2023, Gorelik received an email from jenniferzavala@safewaycorporate.com with the subject line, "Vendor #".  The e-mail from the "Invoice and Billing Supervisor" went on to read, "989425 Please reference this on all orders."

14.     Gorelik later received a purchase order via email for $432,000.00 worth of Russian king crab. Gorelik received a second purchase order via email for king crab from the same "Safeway" buyer for $296,388.00. Both purchase orders were sent from Christopher Delgado (aka SUBIL) at the email, notifications@safeway2.odoo.com.  In looking at their website, Odoo provides business management software tools, including billing and accounting. At the bottom of the purchase order emails, generated through Odoo, is the email, chrisdelgado@safewaycorporate.com, the website, www.safewaycorporate.com, and the telephone number, 800-674-3635. After receiving the purchase orders and believing they were legitimately from Safeway, Gorelik authorized the release of the product from North Star Cold Storage in Stanwood for both purchases.

15.     After the second order, Gorelik realized he had over charged the buyer and attempted to contact the buyer by phone but was unable to reach him. Gorelik informed me that he attempted to call every phone number provided to him by Delgado and his associates, including a phone number Gorelik described as Delgado's (aka SUBIL) cellular phone number, (208) 509-9598, **TT1**. Gorelik stated he also tried the various toll-free numbers provided in the email signatures of chrisdelgado@safewaycorporate.com (888-712-1983 Ext 730), bridgetwood@safewaycorporate.com (800-674-3635 Ext 732), and jenniferzavala@safewaycorporate.com (800-674-3635 Ext 710) to no avail.  As a result, Gorelik called the Director of Seafood from Albertson's, Anthony Snow, and discovered the people he had been communicating with did not work at Safeway or

AFFIDAVIT OF SA DAVID SPITZER - 5
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Albertson's. Gorelik was informed by Anthony Snow the purchase orders were fake, and that Arctic Seafood was not set up as a vendor for Safeway or Albertson's.

**B.   Safewaycorporate.com and Associated Contact Information**

16.     The domain safewaycorporate.com, used by DELGADO, SUBIL and others known and unknown, is not an actual Safeway e-mail or web server. Based on an open-source search, the domain "safewaycoporate.com" was registered to "Tucows Domains, Inc." on December 27, 2022[1], the day before the first communication with Arctic Seafoods and its owner, Alex Gorelik. Even though the domain was registered with Tucows Domains, based on another open-source search, the hosting provider is Google LLC, but the hosting server is SiteGround[2].   On February 14, 2023, Google responded a preservation letter that they did not have responsive information related to the domain and email addresses related to this fraud.  SiteGround has not yet responded to the preservation order.  "Safewaycorporate.com" is set to automatically redirect to the actual Albertson's homepage.

17.     The real safeway.com domain, associated with one of the largest food and drug retailers in the United States, has been registered since 1995 and is administered by "Network Solutions LLC," and is Albertsons.com.

18.     The 800-674-3635 and 888-712-1983 phone numbers listed in the e-mails from Delgado (aka SUBIL) and his associates do not appear to be real and are not listed on Safeway's website. A web search for those phone numbers produced no results associated with Safeway. Safeway's website lists their corporate phone number as 877-723-3929.

19.     The e-mail addresses are also in the incorrect format for Safeway or Albertson's. Deputy Klassen and I have communicated with several actual employees

---

[1] Based on a search of Whois.com.  According to their website, a Whois domain lookup allows you to trace the ownership and tenure of a domain name. Similar to how all houses are registered with a governing authority, all domain name registries maintain a record of information about every domain name purchased through them, along with who owns it, and the date till which it has been purchased.

[2] https://securitytrails.com/list/apex_domain/safewaycorporate.com (last visited February 12, 2023)

1  from both companies and their e-mails are formatted

2  "firstname.lastname@company.com," unlike the emails sent from Delgado (aka SUBIL)

3  and his associates.

4      20.    The Director of Seafood from Albertson's informed Gorelik the purchase

5  orders were not valid or created with the software that Safeway or Albertson's uses.

6      **C.    Fake Purchase Orders Created by Odoo**

7      21.    On February 10, 2023, Deputy Klassen received a response from Odoo's

8  Vice President of Sales and Customer Account Management, Brett Hydeman, in response

9  to an inquiry regarding the account used by Delgado (aka SUBIL) to send the purchase

10  orders to Arctic Seafoods.  Mr. Hydeman stated that a "free trial" account was created on

11  December 29, 2022, which is the day after communication began between "Safeway

12  Corporate" and Arctic Seafoods. The last time Delgado (aka SUBIL) logged into his

13  account was February 1, 2023, which corresponds to the date that the last purchase order

14  was sent to Arctic Seafoods.  The email address used to create the Odoo account was

15  chrisdelgado@safewaycorporate.com and the name provided was Christopher Delgado

16  (aka SUBIL). Odoo was able to provide the last internet protocol (IP) address used.  An

17  open-source search of this IP address reveals that it originates in Council Bluffs, Iowa

18  and belongs to Google LLC.  Mr. Hydeman was unsure if that IP address was related to

19  their servers, or the IP address used by Delgado (aka SUBIL).  Based on my training and

20  experience, it is my belief that due to the sophistication of this scheme, it is likely that

21  Delgado (aka SUBIL) would use a virtual private network (VPN)[3] to disguise his

22  location and identity.

23

24

25

26

27  [3] According to Forbes, VPN software protects your information by masking your device's IP address. The software
encrypts your data and routes it through secure networks to servers in faraway states or other countries. A VPN

28  hides your online identity, allowing you to browse the internet anonymously.
(https://www.forbes.com/advisor/business/software/why-use-a-vpn/)

**D.**     **First and Second Pick-up from North Star Cold Storage**

22.     On January 23, 2023, North Star Cold Storage provided Deputy Klassen with bills of lading from the transactions involving Arctic Seafoods for January 18, 2023, and January 20, 2023.  The bill of lading from January 18, 2023, listed 300 cases of 6/9 count red king crab and 300 cases of 4/7 count king crab. The second bill of lading was dated January 20, 2023, and listed 360 cases of king crab legs and claws, 40 cases of Opilio snow crab and 240 cases of 6/9 count red king crab legs and claws.

23.     North Star Cold Storage also provided Deputy Klassen with the trucker sign-in log from both days. The log from January 18, 2023, listed the driver's name as "Juan Sanchez" and the trucking company as "Jorge Trucking." According to the log, the truck arrived at about 7:08 a.m. and left at about 8:42 a.m. The log from January 20, 2023, also listed Juan Sanchez from Jorge Trucking. The truck arrived at about 7:00 a.m. and left at approximately 9:00 a.m.

24.     On January 23, 2023, Deputy Klassen reviewed footage from the North Star Cold Storage facility from January 18, 2023, and January 20, 2023.[4]  Video from January 18, 2023, showed a white truck with two axles and a refrigeration unit mounted above the cab arriving to pick up the merchandise. According to Deputy Klassen's review of the footage, the truck appeared to be at least 26 feet long, had a "Ryder" logo on the side, and a reflective stripe running the entire length of the box.

---

[4] Based on Deputy Klassen's review of the surveillance footage and speaking with employees at the storage facility, it is apparent that the time stamp from the video is not accurate.

1
2
3
4
5
6
7
8
9
10
11



12    25.    On February 8, 2023, I sent a subpoena to Ryder for information regarding

13  rental information for the trucks used on January 18, 2023, and January 20, 2023, to

14  transport the stolen goods.  On February 22, 2023, I received the Ryder rental truck

15  agreement and global positioning records. The truck was rented by Global Supply

16  Systems, Inc. with the listed contact as David SUBIL. The Ryder truck, rented by SUBIL

17  picked up the stolen shipments from North Star on January 18th and 20th of 2023.

18  SUBIL provided Ryder with **TT2** as his contact, the same number used to sell the stolen

19  shipments in Florida.  Ryder records also provided the driver information, which lists

20  Juan Manuel SANCHEZ-Abreu with an associated Florida driver's license. This is the

21  same driver that was identified picking the third shipment on January 25, 2023, as

22  discussed in the paragraphs below.

23    **E.    Third Pick-Up from North Star Cold Storage**

24    26.    On January 23, 2023, Gorelik advised Deputy Klassen DELGADO (aka

25  SUBIL**)** contacted him from **TT1** and was attempting to purchase a third truckload of crab.

26  This call occurred from **TT1** to Gorelik based upon my review of phone tolls from **TT1**,

27  received from T-Mobile, as well as Gorelik informing me that **TT1** is the number that

28  appeared on the screen of the phone when this call occurred. On January 24, 2023, Gorelik

AFFIDAVIT OF SA DAVID SPITZER - 9
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sent Deputy Klassen the third purchase order for 6,250 pounds of 4/7 legs and claws and 6,250 pounds of 6/9 king crab, totaling $450,000.00. This purchase order was sent to Gorelik from Delgado (aka SUBIL) at notifications@safeway2.odoo.com, but listed the chrisdelgado@safewaycorporate.com email account, as well as the www.safewaycorporate.com web domain at the bottom of the email.  According to Gorelik, the purchase order had the incorrect weight, and another purchase order was sent to Gorelik approximately five minutes later with the correct weight (totaling 12,000 pounds instead of 12,500 due to the size of the pallets) and a total purchase order amount of $432,000.00. This purchase order was sent from and contained the same information as the incorrect purchase order described above. Gorelik worked with North Star Cold Storage to put product of lesser value in boxes labeled as the product ordered. Gorelik then advised Delgado (aka SUBIL) the product was released. Soon thereafter, North Star Cold Storage received a phone call from Delgado (aka SUBIL) to schedule the pickup, which was scheduled for 8:00 a.m. on January 25, 2023.  Deputy Klassen arranged for the use of unmarked vehicles to follow the truck from the North Star Cold Storage on January 25, 2023, after the product was loaded into the truck. On the morning of January 25, 2023, Deputy Klassen and members of the Violent Offender Task Force, operating in unmarked vehicles, set up around the North Star Cold Storage warehouse.  Deputy Klassen contacted an employee at the facility, identified as A.L., and he advised Deputy Klassen he would handle the transaction like any other by bringing the driver the sign-in sheet and then loading the truck.

27.    On the morning of January 25, 2023, Deputy Klassen and members of the Violent Offender Task Force, operating in unmarked vehicles, set up around the North Star Cold Storage warehouse.  Deputy Klassen contacted an employee at the facility, identified as A.L., and he advised Deputy Klassen he would handle the transaction like any other by bringing the driver the sign-in sheet and then loading the truck.

28.    At approximately 7:00 a.m., Deputy Klassen observed a white tractor trailer bearing Florida license plate number JD29UD and registered to Juan Manuel SANCHEZ-

AFFIDAVIT OF SA DAVID SPITZER - 10
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Abreu, parked in the loading dock of North Star Cold Storage.  At approximately 7:40 a.m., Deputy Klassen observed a male wearing a black hooded jacket exit the white tractor trailer and walk back to open the doors on the back of the trailer.  Deputy Klassen observed the unknown subject and noted he was close in stature and appeared to look like the driver he had previously seen in surveillance footage from the pickup on January 20, 2023.

29.     A.L. texted Deputy Klassen an image of the trucker sign-in log.  Deputy Klassen observed that the driver's name and signature box were filled out with scribbles. The signature scribble bore a close resemblance to the signature from the prior two events. The trucking company name was listed as "Jorge Trucking." The cell phone number was clearly written as "360-798-4436." A.L. also texted Deputy Klassen a photo of the license plate as the tractor trailer departed the facility. The trailer plate was a Florida plate, "QA84KI," however the "4" was black while the other letters was blue. The "4" appeared to be a house number affixed to the plate. Deputy Klassen noted the Department of Transportation (DOT) number, "3684599," and company name, "DBH Transport LLC," on the side of the truck.



30.     Deputy Klassen and the unmarked units followed the tractor trailer as it traveled southbound on Pioneer Highway, eastbound on State Route 532, then southbound on Interstate 5. It exited on State Route 530 and initially turned into a gas station on the west side of Interstate 5, before crossing over Interstate 5 and going to the Pilot truck stop, located at 2430 State Route 532 in Arlington, WA, on the east side of Interstate 5. A passenger entered the cab, and the vehicle was refueled. Around 9:00 a.m., the truck exited the fuel stop and resumed driving southbound on Interstate 5.  Deputy Klassen noted the "4" on the license plate had fallen off, and the license plate now read QA81KI.

31.     Deputy Klassen contacted Trooper Eberle with Washington State Patrol's (WSP) Commercial Vehicle Enforcement Division. Trooper Eberle advised Deputy Klassen that he looked up the truck's DOT number and it was not valid. Trooper Eberle advised that the State Patrol could open the weigh station south of the City of Everett, Washington, and perform a commercial vehicle inspection. The tractor trailer entered the weigh station and Trooper Eberle and Trooper Lemmon performed an inspection.

32.     The driver was identified by Florida Driver's License as A.C.C. and the passenger was identified by Florida Driver's License as Juan Manuel SANCHEZ-Abreu.

33.     WSP Troopers were advised by the occupants they were going to Portland to deliver the load to Albertson's. Trooper Eberle texted Deputy Klassen an image of the bill of lading given to him by SANCHEZ.  It should be noted the bill of lading that SANCHEZ presented looked nothing like the two previous bills of lading that Deputy Klassen reviewed from North Star Cold Storage. The date on the top of the bill of lading SANCHEZ presented was January 18, 2023[5], the trucking company was listed as Jorge Trucking, and the destination was listed as "Albertson's/Safeway at 17505 NE San Rafael, Warehouse 97230". The shipper was listed as Arctic Seafood with the street filled in as North Star Cold Storage in Stanwood, WA. The items loaded in the trailer were

---

[5] The date of this trip was January 25, 2023.  See image of fraudulent bill of lading presented to Trooper Eberle below this paragraph.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   described as 12 units of frozen crab, weighing 1250. Handwritten diagonally across the

2   document is "Call Chris" with **TT1** written directly underneath, which is the same

3   number that DELGADO provided to both North Star Cold Storage and Arctic Seafoods.

4   The seal number "0609777" was handwritten in different handwriting near the bottom of

5   the document.



22   34.   Deputy KLASSEN requested the current bill of lading from North Star

23   Cold Storage, which had just been provided to the driver of the truck earlier in the

24   morning. When Deputy Klassen received the image of the document, he noted it matched

25   the other two bills of lading in format. The authentic bill of lading listed 12,000 pounds

26   of product, almost ten times as much listed on the bill of lading presented to WSP

27   Troopers.

STRAIGHT BILL OF LADING-SHORT FORM-ORIGINAL-NOT NEGOTIABLE

35.     Based on this information, I believe the bill of lading SANCHEZ presented to WSP Troopers was forged and that SANCHEZ knowingly presented the forged document as they had been given the legitimate bill of lading before leaving North Star Cold Storage. Based on the photo of SANCHEZ on his Florida driver's license, Deputy Klassen informed me that SANCHEZ closely resembles the driver who also picked up the product from North Star Cold Storage on January 20, 2023.

36.     The tractor trailer left the weigh station at approximately 10:45 a.m. and continued southbound on Interstate 5.  A short time later, Deputy Klassen and other law enforcement officers initiated a vehicle stop of the tractor trailer near Tacoma, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

37.     Deputy Klassen approached the driver's side and contacted SANCHEZ. Deputy Klassen instructed SANCHEZ to turn the vehicle off and step out, which he did. Deputy Klassen frisked him for weapons and attempted to read SANCHEZ his Miranda Warnings verbatim from the department issued card, but SANCHEZ stated he didn't speak English and needed a translator. Due to the traffic, it was difficult to hear so Deputy Klassen placed SANCHEZ in the back of a patrol vehicle.  Deputy Klassen called the language line and, through an interpreter, read SANCHEZ's Miranda Warnings verbatim from his department issued card. SANCHEZ stated he understood his rights and that he did not wish to speak with Deputy Klassen. SANCHEZ was placed back into the rear of the patrol vehicle.

38.     Deputy Klassen then spoke with the passenger, A.C., in another patrol vehicle. Deputy Klassen was sitting in the driver's seat, A.C. was sitting in the passenger seat, and a deputy with a bodycam was recording from the backseat. Deputy Klassen called the language line for A.C., as well, and, through an interpreter read the Miranda Warnings verbatim from his department issued card.  A.C. stated he understood his rights and he was willing to speak with investigators without a lawyer present.

39.     A.C. stated he and SANCHEZ both live in Florida, that he was out of money, and badly needed work. A.C. said he had worked for SANCHEZ before, and that SANCHEZ set up the transaction. A.C. said he used SANCHEZ's name at the cold storage facility because J.S.A was the owner of the trucking company. A.C. stated he and SANCHEZ had come from Florida on Friday to do this job, but he wasn't sure about the date.  A.C stated he was delivering the product to Portland and didn't know anything about the paperwork SANCHEZ had given the trooper. A.C. showed Deputy Klassen a WhatsApp thread that included SANCHEZ's name at the top. A.C. scrolled through it, showing Deputy Klassen the length of their communication.  Deputy Klassen didn't see any recent communication and didn't see if they had any communications regarding their arrangement for this delivery, A.C. stated there was not.

40.     A.C. and SANCHEZ consented to a search of the van. Deputy Klassen removed the seal from the back of the trailer, reading "0609777" as listed on the fraudulent bill of lading but was not the same as the one, "0008788," listed on the legitimate bill of lading.

41.     Deputy Klassen entered the back of the trailer and observed the pallets North Star Cold Storage loaded.  Deputy Klassen was unable to move the pallets due to weight and could only inspect the closest two. They bore pallet "license plates" identical to two of the boards photographed and sent to Deputy Klassen by A.L., bearing the lot number 42435-N and boards 4 and 6. The product label showed Arctic Seafood King Crab, packed by North Star.

42.     Deputy Klassen entered the cab of the vehicle, located, and seized multiple cell phones, a tablet, and GPS device, believing all could provide valuable evidence of this crime and that seizing them could preserve evidence while applying for a search warrant.  Deputy Klassen searched for both the real and fake bills of lading but could not find either. There were numerous other bills of lading and trucking documents in manila envelopes, but these documents were not associated to the documents related to this date, so Deputy Klassen did not seize them.

43.     Deputy Klassen compared his in-person contact with SANCHEZ, on this date, with the subject observed in the security footage from the theft that occurred on January 20, 2023.  Based on his comparison of the two individuals, Deputy Klassen believes that it was SANCHEZ on both occasions based upon observed physical characteristics – to include height, weight approximate age, dark-skin complexion, and a distinct bulbous nose.  Additionally, the individual on the surveillance footage wore a hooded dark-colored jacket with a tan-colored pocket on the chest, right shoulder, and stomach area.  During the in-person encounter with SANCHEZ, Deputy Klassen observed that SANCHEZ was wearing a dark-colored jacket with the hood pulled up and tan-colored pockets in the same locations as on the jacket as previously observed on the surveillance footage.

AFFIDAVIT OF SA DAVID SPITZER - 16
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.     Based on his investigation, Deputy Klassen developed probable cause that SANCHEZ committed the crime of forgery and knowingly possessed a fraudulent bill of lading, which he used to avoid detection while transporting a load of fraudulently obtained product.

45.     Deputy Klassen advised SANCHEZ he was under arrest and placed him in handcuffs.  SANCHEZ informed Deputy Klassen that he was willing to release the truck to A.C.  Deputy Klassen advised A.C. very clearly the product in the back of the trailer was not actually crab and was unsellable.  SANCHEZ was transported and booked into the Snohomish County Jail.  A few hours later SANCHEZ was bailed out of the Snohomish County Jail, and it is unknown where SANCHEZ. traveled to after he was released from police custody.

46.     On January 30, 2023, the Stanwood Police Department received a police report from the Sioux City, Iowa Police Department regarding a stolen tractor trailer reported on September 6, 2022.  On that date, SANCHEZ reported that his tractor trailer had been stolen from the side of Interstate 29.  This tractor trailer is the same vehicle, as identified by Florida license plate, that arrived at North Star Cold Storage on January 25, 2023, to pick up the third shipment. In the police report, SANCHEZ claimed he had a flat tire, walked to the nearest truck stop to get help, and when he returned found that his truck and trailer had been stolen. SANCHEZ informed police he had the keys and had locked the vehicle, so he had no idea how the thief was able to take the truck. According to the report, SANCHEZ owned a business called Chris Trucking Road Services.  It should be noted at the time of this theft SANCHEZ was hauling a load of Arctic Seafoods crab from Chesapeake, Virginia, to Seattle, Washington.  Gorelik informed me that Arctic Seafoods was just moving product from one cold storage facility to another.

47.     The Sioux City detective that investigated this crime noted that SANCHEZ stated he had a cell phone at the time of the vehicle breakdown but decided to walk a total of 45 minutes to get help instead of summoning help by using his cellular phone. After an initial conversation, the detective attempted to reach SANCHEZ and the number that

initially worked for SANCHEZ was no longer in service.  The detective also learned that the companies involved in this also were unable to reach SANCHEZ ever again. The detective also noted that route of travel did not make sense for a westbound trip from Virginia to Washington.  At the time of the theft, SANCHEZ was traveling southbound through Sioux City, Iowa.

48.     The detective concluded, through many interviews of people involved, that SANCHEZ was likely involved in the disappearance of his tractor trailer**.** At this time, throughout various locations in the Midwest, there were a significant number of vehicle thefts mostly involving tractor trailers full of meat. Due to the lack of evidence and an inability to reach SANCHEZ again, the Sioux City Police Department closed their case. Based on my discussions with other law enforcement officers involved in this case, as well as the evidence reviewed, it is my belief that SANCHEZ was probably involved in the theft of the merchandise inside his truck and likely sold the product for a considerable profit. It seems to be no coincidence that SANCHEZ and/or a coconspirator approached the same company, Arctic Seafoods, using a different name (Christopher DELGADO aka SUBIL), with the aforementioned scheme several months after being involved in the theft of their product.

49.     On February 23, 2023, I reviewed the phone tolls for **TT2**.  Following the arrest of SANCHEZ on January 25, 2023, at approximately 4:15 p.m., there was an outgoing call placed by **TT2** to (425) 388-3395.  An online search of that phone number revealed that it is associated to the Snohomish County Jail, where SANCHEZ was being held.  On January 26, 2023, at approximately 6:26 a.m., there was another outgoing call placed by **TT2** to the same number that is associated to the Snohomish County Jail. The next phone call placed by **TT2**, on January 26, 2023, at approximately 6:26 a.m. was to (425) 388-7050.  An online search of that phone number revealed it is associated to the evidence control unit at the Snohomish County Sheriff's Office. It should be noted that multiple digital devices were seized from SANCHEZ after his arrest on January 25, 2023.

AFFIDAVIT OF SA DAVID SPITZER - 18
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### F.    Fourth Pickup from North Star Cold Storage

50.    On January 27, 2023, Detective Steven Martin with the Stanwood Police Department informed me that Delgado (aka SUBIL) contacted Gorelik once again to facilitate another transaction between the business attempting to impersonate Safeway and Arctic Seafoods. Since the communication is still occurring after the last shipment, it is my belief these shipments may be stored in a warehouse without being opened right away.

51.    On January 30, 2023, Delgado (aka SUBIL) once again contacted Gorelik via **TT1** to set up the next purchase.  As stated above, this call occurred from **TT1** to Gorelik based upon my review of phone tolls from **TT1**, received from T-Mobile, as well as Gorelik informing me that **TT1** is the number that appeared on the screen of the phone when this call occurred. At the behest of law enforcement, Gorelik informed Delgado (aka SUBIL) he would need to push the shipment to Thursday.  Delgado (aka SUBIL) said he would call back on Wednesday to finalize the purchase to pick up the merchandise on February 2, 2023.  A few minutes later, Delgado (aka SUBIL) called Gorelik, via **TT1**, and asked him to send the invoice for the previous shipment on January 25, 2023.  Again, this call occurred based on my review of phone tolls received from T-Mobile for **TT1**. Due to this ongoing investigation, law enforcement agents advised Gorelik to send the invoice to Delgado (aka SUBIL). Arctic Seafoods has not received payment for any of the previous three shipments.

52.    On February 1, 2023, Delgado (aka SUBIL) sent a purchase order to Arctic Seafoods in the amount of $420,000 for a fourth shipment. As described earlier in this affidavit, the purchase order emails are sent from Delgado (aka SUBIL) at notifications@safeway2.odoo.com, but list the chrisdelgado@safewaycorporate.com email account, as well as the www.safewaycorporate.com web domain at the bottom of the email. A copy of the purchase order that is attached to the email is shown below:

AFFIDAVIT OF SA DAVID SPITZER - 19
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970





53. The information contained in the above purchase order is not associated to the legitimate Safeway company. Based on the open-source search of the associated address, it returns to the Albertson's corporate office headquarters, which is Safeway's parent company. The phone number does not come back associated with any Albertson's entity. For reference, Detective Martin received a copy of a legitimate Safeway purchase order from Scott Heggan, the Meat, Seafood, and Deli Procurement Manager from the Seattle Division of Albertsons Companies, which is shown below.

AFFIDAVIT OF SA DAVID SPITZER - 20
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

54.     On February 2, 2023, at approximately 4:08 p.m. Linda Boggs from North Star Cold Storage informed Delgado (aka SUBIL), using **TT1**, called to schedule a pickup for February 3, 2023, at approximately 1:00pm.  North Star informed me that they observed **TT1** on their caller identification, and I confirmed the phone call using phone tolls received from T-Mobile.

55.     On February 2, 2023, at 4:21 p.m., Jennifer Zavala (aka SUBIL) (jenniferzavala@safewaycorporate.com) sent an email to Arctic Seafoods advising, "We have you scheduled for payment invoice #230120-1 on February 21, 2023." Previously, on January 23, 2023, Zavala (aka SUBIL) sent an email to Arctic Seafoods stating the first invoice (invoice #230118-2) will be paid on February 17, 2023. As of February 22, 2023, there has been no payment received for either shipment. Based on evidence discovered through this investigation, law enforcement officers believe all of the names, phone numbers, and email addresses are fictitious, and no payments will be made.

AFFIDAVIT OF SA DAVID SPITZER - 21
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

56.    On February 3, 2023, Delgado (aka SUBIL), using **TT1**, cancelled the pickup, stating there were truck problems. **TT1** was, once again, observed by North Star on their caller identification.

57.    On February 3, 2023, I sent a subpoena to T-Mobile for subscriber information and phone tolls related to Delgado's (aka SUBIL) number, (208) 509-8598. T-Mobile was able to send the phone tolls; however, they informed me that the service is with Tracfone Wireless.  The T-Mobile representative informed me that Tracfone uses T-Mobile towers, so they were able to provide call data, but Tracfone holds the subscriber data.  On February 6, 2023, I sent a subpoena to Tracfone Wireless for subscriber information regarding this phone number.  On February 22, 2023, Tracfone Wireless responded that the subscriber was "copy_1 1478424248," with an associated address of 1478424248, Boise, ID 83706.  Based on my experience, individuals involved in criminal activity often used prepaid phones to conceal their identity and their illicit activities.

58.    On February 7, 2023, the owner of Arctic Seafoods, Alex Gorelik, was contacted by Delgado (aka SUBIL) via email from chrisdelgado@safewaycorporate.com. Delgado (aka SUBIL) stated, "Hello. I'm just checking in to see how the production looks this week. Give me a heads up if you can." Gorelik responded he would have a better idea the following month and Delgado (aka SUBIL) responded, "Oh, ok. What type of inventory do you have available at the moment?" Based on the information available during this investigation, it is my belief that Delgado (aka SUBIL) is attempting to get more merchandise from Arctic Seafoods, while continuing to misrepresent himself as a representative of Safeway/Albertsons. I further believe he intends on not paying for the merchandise.

59.    On February 7, 2023, at approximately 4:15 p.m. North Star Cold Storage informed me that Delgado (aka SUBIL), using **TT1**, scheduled a pickup of the fourth shipment for February 8, 2023, at approximately 11:00 a.m.  The purchase order related to the shipment had been previously sent on February 1, 2023 and is found on page 19 of this affidavit. **TT1** was, once again, observed by North Star on their caller identification.

AFFIDAVIT OF SA DAVID SPITZER - 22
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**F.    Stolen Property from First and Second Pick-up Found in Florida**

60.    On February 1, 2023, at approximately 8:52 a.m., Gorelik contacted me by telephone and stated that at approximately 7:30 a.m., one of Gorelik's customers, M.G., who is based out of Florida informed him he had received an offer by both text message and email from Bob Interian of Jomara Seafood, based out of Hialeah, Florida, to buy crab.  M.G. informed Gorelik that based on the description of the seafood and the pictures that were sent to him by Interian, it appeared to be Arctic Seafood's crab.  M.G. noted the prices that Interian offered were below market value.

61.    Gorelik immediately suspected it was the crab stolen from Arctic Seafood by Delgado (aka SUBIL) and others, who previously represented themselves as Safeway corporation. M.G. forwarded Gorelik pictures Interian had sent him, including pictures of the box and a label.  The label showed the lot number (Lot #: 42306-N) that was listed on both the purchase order sent from Delgado (aka SUBIL) to Arctic Seafoods and the invoice that Arctic Seafoods sent Delgado (aka SUBIL) on January 18, 2023.   This lot number was included in the first shipment that was taken by deception on January 18, 2023, from the North Star Cold Storage Facility in Stanwood, WA.  Gorelik informed me the description of many of the other products being sold by Interian match the products that were also picked up from the Stanwood facility on January 18, 2023, and January 20, 2023.  According to M.G., the product was being held at Neptune Cold Storage, located at 7337 NW 37th Avenue in Miami, Florida.

62.    On February 2, 2023, I contacted the owner of Interian to inform him the products he was attempting to sell were stolen. Interian stated he was unaware the products had been stolen and provided me with one of the invoices from Global Supply P and P Inc., the company he purchased the stolen goods from. He further stated he purchased the stolen goods from an individual named **David**.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18   63.    Interian stated he was given a business card by "David." This card had two

19   phone numbers, 833-231-1955 and 786-403-3168 (**TT2**).

20
21
22



23
24
25

26   64.    On February 3, 2023, Interian provided me with the receipt of wire transfer

27   that Jomara Seafoods made to Global Supply P & P Inc. earlier that day. The wire

28   transfer was made to the TD Bank account listed on the invoice above, ending in -5278,

AFFIDAVIT OF SA DAVID SPITZER - 24
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in the amount of $144,750.00.  According to Interian, Jomara Seafoods made two orders of crab from Global Supply P & P Inc. and made one wire transfer totaling $144,750.00.

65.     Global Supply P & P Inc, is an active Florida Company. The company's registered agent is David SUBIL, and the registered address of the company is 6415 SW 42 Street Miami Florida, 33155. The Company was incorporated on September 15, 2020. This company has a website, https://www.globalsupplysystemsinc.com. While the number provided to contact the company on the website is 833-231-1955, INTERIAN informed me that he and David communicate using **TT2**.  Interian sent me a contact card to my cell phone, which lists the contact's name as David Global Food and **TT2** as its associated phone number.  Interian said that he has spoken to David on **TT2** on several occasions, most recently on February 16, 2023.

66.     On February 16, 2023, a subpoena was sent to T-Mobile for subscriber information for **TT2**.  T-Mobile responded the subscriber was David SUBIL with an associated address of 6801 SW 83rd Place, Miami, FL 33141. SUBIL has been the subscriber of this phone number since August 9, 2021.

67.     SUBIL is the registered agent of a second company, SURF & TURF 2 YOU CORP, incorporated on May 25, 2022. The registered address is 6415 SW 42 Street Miami Florida, 33155. This company has a website, https://surfandturftoyou.com. The number provided to contact the company on its website, 833-231-1955, is the same as one of the numbers on the card given to Interian by David.

68.     Based on a search of the Florida Department of Motor Vehicles, SUBIL has an issued driver license (S-140-160-71-148-0) with two addresses listed.  One being the registered address of Global Supply P & P Inc at 6415 SW 42nd Street in Miami, FL and the other being the address listed on the invoice above for wire transfers to Global Supply P & P Inc. at 6801 SW 83rd Place in Miami, FL.  The address found on the top of the invoice for Global Supply P & P Inc. is 6800 Bird Road, PMB 462 in Miami, Florida.  An open-source check of this address reveals that it is a UPS store in Miami, Florida.

AFFIDAVIT OF SA DAVID SPITZER - 25
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

69.     SUBIL has a long criminal history, including, but not limited to, Grand Theft of the 2nd Degree, Grand Theft 3rd Degree and Fraud-Swindle.  An online search reveals that in two prior instances, he has purchased seafood and meat with counterfeit checks.

70.     I obtained a recent mugshot of David SUBIL. He was arrested by the South Miami Police Department in October 2022 for DUI and Damage to Property or Person.



71.     On Tuesday, February 7, 2023, Interian emailed still photographs from the surveillance cameras at Jomara Seafood in Miami, Florida. According to Interian, the photographs depict the individual that sold him the crab and who he referred to as "DAVID." Based on the investigation, I believe the man in the photographs is SUBIL.



AFFIDAVIT OF SA DAVID SPITZER - 26
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**G.     Surveillance and GPS Tracking of Fourth Shipment**

72.     On February 8, 2023, at approximately 9:30 a.m., a dispatcher from NW Freight contacted North Star Cold Storage to confirm the pickup of the shipment. At approximately 11:30 a.m., a semi-truck with a black cab, bearing Washington license plate 94919RP, and white trailer, bearing Washington license plate 18986AG, approached the loading docks of North Star Cold Storage.  I was able to see the cab had "NW Freight" on both sides of the truck's doors. A North Star employee approached the truck and was able to confirm this vehicle was, in fact, there to pick up the target shipment. The target shipment included a box with a court authorized GPS tracking device.  On February 1, 2023, U.S. Magistrate Judge Mary Alice Theiler issued a warrant authorizing the installation of a GPS tracking device in the target shipment. No. MJ23-049-1 (W.D. Wash. February 1, 2023).  After the warrant was issued, on February 1, 2023, at approximately 1:50 p.m., I installed the tracking device in one of the boxes and put the box in the middle of pallet 3.

73.     On February 8, 2023, at approximately 12:20 p.m., after the pallets were loaded onto the truck, it left the cold storage facility and began traveling eastbound on SR-532 toward Interstate 5. While traveling toward Interstate 5, I coordinated with WSP's Commercial Vehicle Enforcement Division to inspect the truck and its occupants. Upon entering the ramp to merge onto Interstate 5 southbound, WSP Trooper Travis Snider initiated a vehicle stop on the truck.  Trooper Snider informed me the driver of the truck was Oleksandr Avramyshyn and provided a photograph of his Oregon driver's license. Trooper Snider asked the driver if there was anyone else in the vehicle and initially Avramyshyn denied until eventually Trooper Snider found out that an additional individual was in the sleeper area of the cab, who did not have any identification except a document on his phone with a picture; however, all of the writing was in a foreign language and the subject did not speak any English.  The driver of the truck presented Trooper Snider with the bill of lading, registration, logbook, and information regarding their trip.  Avramyshyn stated they were traveling to Portland and provided an address of

901 NW Eastwind Drive. Trooper Snider took photographs of the documentation and provided them to me via text message and/or email.  At approximately 1:15 p.m., Trooper Snider released the vehicle, and it continued southbound on Interstate 5.

74.     Based on a review of the GPS tracking device, at approximately 5:00 p.m., the truck arrived at the Northwest Freight warehouse in Troutdale, Oregon, where it remained until February 9, 2023, and was then moved approximately five miles to another warehouse, located at 17600 Northeast San Rafael Street in Portland, Oregon.  On Friday, February 17, 2023, the shipment moved to the area of Catalina Cold Transfer, located at 2927 NW 74th Avenue in Miami, FL.

75.     On Saturday, February 18, 2023, the shipment moved to the area of Florida's Best Services, located at 702 NW 6th Avenue in Fort Lauderdale, FL.  Based on a Google search, it appears the business provides construction services, as well as junk removal.

76.     On February 18, 2023, at approximately 3:00 p.m. pacific time, HSI Taskforce Agent Walter Duran went to the location of the tracker.  Agent Duran noticed multiple pallets of boxes dumped outside the business and sent me photos.  Based on this, I believe that SUBIL disposed of the shipment once he realized it did not contain the crab he was attempting to steal by fraud.  At approximately 5:00 p.m. pacific time, Agent Duran was able to retrieve the tracking device I had placed. Agent Duran informed me he believed with 70% certainty, he saw SUBIL in the area of the fourth shipment.

**H.     Additional Communication with SUBIL**

77.     On February 15, 2023, Delgado (aka SUBIL) contacted Gorelik via **TT1** and informed him that they had opened the third shipment and determined the product shipped was not king crab. As previously discussed with law enforcement, Gorelik blamed the cold storage facility and determined that they would look into what happened.

78.     On February 15, 2023, and February 16, 2023, Delgado (aka SUBIL), using **TT1**, contacted Gorelik and discussed the third shipment and how they would handle the situation. Gorelik informed Delgado (aka SUBIL) that it would be a process and the

product should not be sent back to the cold storage facility at this time, until a full investigation can take place. These two calls were recorded.

79.      On February 16, 2023, Interian informed me that David had contacted him from **TT2** and wanted to sell him additional crab. Interian told David that he was no longer interested in the product. It is believed that David is still trying to sell the stolen merchandise acquired via the first two shipments of king crab from Arctic Seafoods.

80.      On February 17, 2003, Delgado (aka SUBIL), contacted Gorelik, via **TT2**, and informed him he had opened the fourth shipment and realized it was not crab. At the behest of law enforcement, Gorelik explained he did not know what happened and they would investigate what happened. This phone call was recorded.

## I.      Flight Booked to Colombia and Arrest

81.       On Saturday, February 18, 2023, I was notified that SUBIL had booked a one-way ticket from Miami International Airport (MIA) to Medellin, Colombia.  The flight booking notification was based on an exact match of name and date of birth.  The American Airlines flight (Flight # 1127) was scheduled to depart MIA at approximately 10:32 a.m. eastern on Sunday, February 19, 2023. According to Customs and Border Protection (CBP), the flight was booked on the morning of February 18, 2023, at approximately 8:48 a.m.  Based on Passenger Name Record (PNR) data, which is collected at the time of booking, SUBIL would be traveling alone.  According to CBP records, SUBIL has no international travel in at least the last five years.  SUBIL has no known connection to Columbia. Based on my experience and the recent activity in this case, I believe this travel was booked to flee the country from potential prosecution.

## K.      Arrest of David SUBIL in Florida

82.      On February 18, 2023, the Honorable David W. Christel reviewed and signed a Complaint and Arrest Warrant for David SUBIL (see MJ23-074). SUBIL was subsequently arrested on February 19, 2023, at the Miami Airport with several electronic devices on his person and over $11,000 cash. SUBIL had his initial appearance in Miami, Florida on February 21, 2023. SUBIL'S counsel has advised the Assistant United States

Attorney Jocelyn Cooney that he will be challenging detention and transfer. A hearing date is anticipated to be set for the week of February 27, 2023.

83.    Gorelik has received no further calls from **TT1** since February 18, 2023.

84.    Interian has received no further calls from **TT2** since February 16, 2023.

## **KNOWLEDGE BASED ON TRAINING AND EXPEREINCE**

85.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.

86.    Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course. The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call. They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content. In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

87.     Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts. The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

88.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network. When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI. Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication. Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

89.     In my training and experience, I have learned that T-Mobile is a company that provide cellular telephone access to the general public. I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

90.     When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application-initiated data transfers, among other things.

91.     Based on my training and experience, I know that T-Mobile can collect cell-site data about Target Telephones. Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

92.     Different service providers use different systems, applications, and reports to collect or analyze cell site data. These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Location Database of Record or "LOCDBOR" (AT&T), EVDO, ALULTE, Timing Advance and True Call (T-Mobile/Sprint/US Cellular/GCI).  RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

93.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about

the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephone's user or users and may assist in the identification of co-conspirators and/or victims.

94.     Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone. These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone. To provide for any such changes made to the Target Telephones, Attachment A1 specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

AFFIDAVIT OF SA DAVID SPITZER - 33
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## AUTHORIZATION REQUEST FOR TARGET TELEPHONES

95.    Based on the facts set forth in this affidavit, there is probable cause to conclude that violations of 18 U.S.C. § 2314, Interstate Transport of Stolen Property have been committed by users of the target telephone(s) and others who are known and unknown. The requested information for the target telephone(s) will help law enforcement identify the locations and user(s) of the target telephones and identify other coconspirators and other people and places of evidentiary value. There is probable cause to believe that the use of the investigative technique described by the warrant will result in officers learning that identifying information.

96.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)

97.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscriber or user of the Target Telephone(s) until 90 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Telephone(s) would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

98.    I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession,

AFFIDAVIT OF SA DAVID SPITZER - 34
USAO 2023R00150

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services. The agency shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

99.   Pursuant to 18 U.S.C. § 2703(g), the government will execute these warrants by serving the warrants on T-Mobile. Because the warrants will be served on T-Mobile, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night.

100.   This warrant is being submitted via reliable electronic means. Fed. R. Crim. P. 4.1 & 41(d)(3).

Respectfully submitted,

David Spitzer
Special Agent,
Homeland Security Investigations

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on this 28th day of February, 2023.

HON. MARY ALICE THEILER
United States Magistrate Judge

**ATTACHMENT A-1**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number:

      a.      (208) 509-8598 (hereinafter "Target Telephone 1" or "**TT1**"). **TT1** is a cellular telephone with International Mobile Subscriber Identity (IMSI) 310240225402804, with subscriber "copy_1 1478424248," at 1478424248, Boise, ID 83706, with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT1** is described herein and in Attachment A1, and the location information to be seized is described herein and in Attachment B.

The subscriber/customer of the Target Cell Phone is unknown. The identity of the person who is the subject of the criminal investigation is David SUBIL.

2.      The Target Cell Phone **TT1**.

3.      The property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713. As such, this warrant authorizes the collection of subscriber records, cell site data, and cell site triangulation information regarding the Target Cell Phones. **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).** Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

**I.     Section I: Information to be Disclosed by T-Mobile**

1.     **Subscriber/Account Information.** The following non-content information about the customers or subscribers associated with the Account listed in Attachment A1:

a.     Names (including subscriber names, user names, and screen names);

b.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.     Local and long distance telephone connection records from **December 27, 2022, through February 27, 2023**;

d.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions from **December 27, 2022, through February 27, 2023**;

e.     Length of service (including start date) and types of service utilized;

f.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifiers (MEID), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identity Identifiers (IMSI), or International Mobile Equipment Identities (IMEI);

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.    Other subscriber numbers or identities (including the registration Internet Protocol (IP) address); and

h.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.    **Historical Cell Site Location Information**.

a.    All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from **December 27, 2022, through February 27, 2023**, including:

i.    the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii.    historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received. This information is to be provided irrespective of the application, name, or report utilized by T-Mobile. Accordingly, this information includes the following data sets to the extent that they are collected by T-Mobile: RTT, PLU, PCMD, LOCDBOR, EVDO, True Call, ALULTE, and Timing Advance.

b.    The physical address and coverage maps of cell towers used by the Target Cell Phone(s).

II.  **Section II: Information to Be Seized by the Government**

1.    All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2314, Interstate Transport of Stolen Property involving Christopher DELGADO, Juan SANCHEZ, David SUBIL, and/or previously unidentified subject(s).

2.    All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.    All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

ATTACHMENT B- 2
USAO# 2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4.      Location Information regarding the Target Cell Phone(s).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by T-Mobile in order to locate the things particularly described in this Warrant.

ATTACHMENT B- 3
USAO# 2018R00962

## ATTACHMENT A-2

### Property to Be Searched and Subscriber/Subject Information

1.      Records and information associated with the cellular phone assigned call number:

      a.      (786) 403-3168 (hereinafter "**Target Telephone 2**" or "**TT2**"). **TT2** is a cellular telephone with International Mobile Subscriber Identity (IMSI) 310260552952910, with subscriber "David SUBIL," at 6801 SW 83rd Place, Miami, FL 33143 with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT2** is described herein and in Attachment A2, and the location information to be seized is described herein and in Attachment B.

2.      The Target Cell Phone TT2.

The property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713. As such, this warrant authorizes the collection of subscriber records, cell site data, and cell site triangulation information regarding the Target Cell Phones. **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).** Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.    **Section I: Information to be Disclosed by T-Mobile**

1.    **Subscriber/Account Information.** The following non-content information about the customers or subscribers associated with the Account listed in Attachment A1:

a.    Names (including subscriber names, user names, and screen names);

b.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.    Local and long distance telephone connection records from **December 27, 2022, through February 27, 2023**;

d.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions from **December 27, 2022, through February 27, 2023**;

e.    Length of service (including start date) and types of service utilized;

f.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifiers (MEID), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identity Identifiers (IMSI), or International Mobile Equipment Identities (IMEI);

ATTACHMENT B- 1
USAO# 2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.     Other subscriber numbers or identities (including the registration Internet Protocol (IP) address); and

h.     Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.     **Historical Cell Site Location Information**.

a.     All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from **December 27, 2022, through February 27, 2023**, including:

i.     the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii.     historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received. This information is to be provided irrespective of the application, name, or report utilized by T-Mobile. Accordingly, this information includes the following data sets to the extent that they are collected by T-Mobile: RTT, PLU, PCMD, LOCDBOR, EVDO, True Call, ALULTE, and Timing Advance.

b.     The physical address and coverage maps of cell towers used by the Target Cell Phone(s).

II.     **Section II: Information to Be Seized by the Government**

1.     All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2314, Interstate Transport of Stolen Property involving Christopher DELGADO, Juan SANCHEZ, David SUBIL, and/or previously unidentified subject(s).

2.     All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.     All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

  4.     Location Information regarding the Target Cell Phone(s).

  Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by T-Mobile in order to locate the things particularly described in this Warrant.

ATTACHMENT B- 3
USAO# 2018R00962